UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

KRISTINE SMALL,

        Plaintiff,

-vs-                              Case No. 5:06-cv-125-Oc-10GRJ

JEFFREY L. CLARK,

        Defendant.
_____/

## MEMORANDUM OPINION

This is an action brought by Petitioner Kristine Small for return of her minor child, Adamas Clark ("Adamas"), pursuant to the Hague Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980, T.I.A.S. No. 11,670, at 4 ("Convention"), as implemented by the United States in the International Child Abduction Remedies Act ("ICARA"), 42 U.S.C. §§ 11601-11610 (1988). The Petitioner argues under the Convention and ICARA that Respondent Jeffrey Clark, the acknowledged father of Adamas, wrongfully abducted him from Belize and retained him in the United States, and that Adamas must therefore be returned to his habitual residence of Belize. The Respondent contends that the child's habitual residence is the United States and, in the alternative, that the Petitioner acquiesced to the child's residency in the United States.

An action under the Convention and ICARA is not an action to determine rights of custody over the child. The Court's task is merely to determine the proper forum for the custody determination.

**Background and Facts**

The Court conducted a three day evidentiary hearing during which both the Petitioner and the Respondent presented evidence pertaining to the Petitioner's claim and the Respondent's affirmative defense. The Court's factual findings are as follows.

The Petitioner is a citizen of Belize and the biological mother of Adamas.[1] The Respondent is a citizen of the United States and the biological father of Adamas.[2] In 1998, the Respondent moved to Belize from New York to pursue business opportunities. The Petitioner and the Respondent met shortly after the Respondent arrived in Belize and began a relationship in 1999. They began living together in Placencia, Belize in July 2001, and around that time the Petitioner assisted the Respondent in moving household goods from New York to Belize and to a storage unit in Leesburg. Adamas was born in Belize on May 6, 2002. Adamas is a citizen of both Belize and the United States; he was officially declared a citizen of the United States on October 22, 2004.[3]

From May 6, 2002 through November 2004 Adamas resided in Belize in the continuous custody of the Petitioner. The Petitioner and Adamas lived in San Ignacio, Cayo District, Belize until June 2004, when the Petitioner, the Respondent, Jonelle and

---

[1] Petitioner's Exhibit #1. The Petitioner is also the biological mother of Jonelle Dial ("Jonelle"), a minor child from a previous relationship. At all times relevant to this matter Jonelle was, and remains, in the custody of the Petitioner.

[2] Petitioner's Exhibit #1.

[3] Respondent's Exhibit #20.

Adamas (the "Family") all moved to a five-acre undeveloped lot near Bullet Tree Falls, Belize (the "Bullet Tree Falls lot"). The Petitioner and the Respondent jointly purchased the Bullet Tree Falls lot in November 2001,[4] planning to develop there a small resort and living quarters for the Family. The parties lived on the Bullet Tree Falls lot from June 2004 until they departed for the United States in November 2004. While living on the Bullet Tree Falls lot the Respondent and the Petitioner began clearing it in preparation for development.

While the Respondent lived with the Petitioner, Jonelle, and Adamas in Belize, the Respondent made periodic trips to Leesburg, Florida. The Respondent is a goldsmith by trade and worked in a jewelry store while in Leesburg. By working in the jewelry store in Leesburg from November 2002 until February 2003, and again from November 2003 to February 2004 – during the busy jewelry season from Thanksgiving to Valentine's Day – the respondent was able to save enough money to live in Belize the rest of the year.

In November 2004, the Family departed for Leesburg. Prior to their departure, the Respondent stored much of the Family's property, including their household furnishings, in a trailer and a box truck that was located on the Bullet Tree Falls lot. The Family drove in their personal truck to Leesburg from Belize through Mexico, bringing with them only personal items, clothing and toys for the children. The Petitioner believed that she was accompanying the Respondent on his periodic trip to Leesburg from November to February

---

[4] Petitioner's Exhibit #7.

because she had recently discovered that the Respondent was having an affair in Belize and the Respondent wanted to prove to the Petitioner that he was not also engaging in an affair during his periodic trips to Leesburg. The Petitioner and Jonelle traveled to the United Sates on tourist visas that expired on May 5, 2005.

From November 2004 through June 3, 2005 the Family lived in a rental home in Leesburg. The lease for the rental home was a short-term, seven-month lease.[5] While in Leesburg, Jonelle received the necessary vaccinations and began elementary school at the local public school.[6] Further, just prior to her return to Belize in June 2005, Jonelle received the vaccinations that would allow her to continue elementary school in Leesburg the following year. While the Petitioner intended that the Family return to their home in Belize in February 2005 – just as the Respondent had done twice before on his own – the Respondent convinced the Petitioner to stay in Leesburg until Jonelle's school year ended.[7]

While in Leesburg, however, Adamas was too young to enter pre-school and, thus, was in the continuous care of the Petitioner, who acted as a stay-at-home mother. There was no evidence that Adamas engaged in any activities outside of the home. Moreover,

---

[5] Petitioner's Exhibit #3.

[6] Due to her immigration status, Jonelle's attendance at the elementary school was illegal, but, as asserted in the Respondent's Post-trial Brief, "is common practice, as done by millions of Mexican families." Respondent's Post Trial Memorandum at 10.

[7] This decision was also likely influenced by the fact that the Respondent had secured a seven month lease on the Leesburg rental home that did not terminate until after the end of Jonelle's school year. On his two previous visits to Leesburg for work, the Respondent had boarded at the home of the jewelry shop owner and had signed no lease.

prior to his return to Belize, Adamas was not enrolled for preschool for the 2005-2006 school year and there was no evidence that he received any vaccinations in preparation for school in Leesburg.

Sometime prior to April 2005, while in Leesburg, the Respondent negotiated an agreement with the owner of the Leesburg jewelry store at which the Respondent worked that allowed him to take over ownership of the store in January 2006. At about the same time in April 2005, the Respondent brought the Petitioner to the offices of an immigration attorney who informed the Petitioner that she must either marry the Respondent and petition for United States citizenship as the spouse of a citizen, or obtain an extension of her tourist visa that would allow her to exit legally the United States following the end of Jonelle's school year. The Petitioner eschewed marriage and chose to seek a brief extension of her and Jonelle's tourist visas.[8]

On June 3, 2005, the Family returned to Belize.[9] The Petitioner, Jonelle, and Adamas traveled to Belize on one-way tickets. The parties returned to the Bullet Tree Falls lot, and the Respondent purchased and located a "shell home" on that property. The parties lived on the Bullet Tree Falls lot until June 23, 2005, when the Respondent removed Adamas to the United States without the knowledge of the Petitioner.[10]

---

[8] Petitioner's Exhibit #14.

[9] Respondent's Exhibit #8; Petitioner's Exhibit #19.

[10] The Respondent claims that his sudden departure from Belize was due to the discovery of a murder plot against him that was being orchestrated by the Petitioner. The Respondent departed from Belize on June 23, 2005, although he traveled there
(continued...)

From the date of his removal from Belize, the Respondent has held Adamas in Leesburg, Florida.[11]

## Procedural History

On August 4, 2005, the Petitioner filed with the Central Authority of Belize an Application for Assistance Under the Hague Convention on Child Abduction.[12] The proceeding in this Court was initiated by the Petitioner on April 7, 2006 by filing in this Court a Petition for Return of Child to Petitioner and Petition for Immediate Issuance of Show Cause Order to Respondent, alleging that the Respondent wrongfully removed Adamas from his habitual residence of Belize. The Respondent filed a Verified Answer, in which he denied the Petitioner's allegations and asserted two affirmative defenses: (1) that the Petitioner acquiesced to the Respondent's retention of Adamas in the United States; and (2) that to return Adamas to Belize would expose him to grave risk of physical or psychological harm.[13]

---

(...continued)
   on a round-trip ticket that brought him back to the United States on June 29, 2005.

[11] The Respondent's allegations concerning the state of Adamas since his removal from Belize are immaterial to the issues before this Court and, as such, will not be addressed. Moreover, "[a] removing parent must not be allowed to abduct a child and then – when brought to court – complain that the child has grown used to the surroundings to which they were abducted." Friedrich v. Friedrich, 78 F.3d 1060, 1068 (6th Cir. 1996).

[12] Petitioner's Exhibit #10.

[13] The Respondent abandoned this affirmative defense prior to the hearing in this

**Standard**

In a case arising out of the Convention and ICARA, a party petitioning for the return of a child has the burden to establish by a preponderance of the evidence that the child was wrongfully removed from his habitual place of residence.  See 42 U.S.C. § 11603(e)(1)(A).[14]  If a court determines by a preponderance of the evidence that a child was removed wrongfully from his habitual place of residence, a respondent may nonetheless assert a successful defense by establishing by a preponderance of the evidence that the petitioner consented to or subsequently acquiesced in the removal or retention of the child.  See 42 U.S.C. § 11603(e)(2)(B); Convention art. 13.[15]  A preponderance of the evidence means such evidence as, when considered with that opposed to it, has more convincing force, and demonstrates that what is sought to be proved "is more likely true than not."[16]  In bench trials, the judge serves as the sole fact-

---

(...continued)
  matter and, thus, the Court will not discuss it further.

[14] "[R]emoval or retention of a child is wrongful where 'it is in breach of rights of custody attributed to a person . . . under the law of the State in which the child was habitually resident immediately before the removal or retention.'" Shalit v. Coppe, 182 F.3d 1124, 1127 (9th Cir.1999) (quoting Hague Convention art. 3(a)).

[15] Pursuant to the Convention and ICARA, a respondent may assert limited, enumerated defenses. See 42 U.S.C. § 11603(e)(2); Convention art. 12, 13, 13b and 20.  ICARA defines a respondents' burden of proof as to each of these defenses, which burden varies depending upon the asserted defense.  See 42 U.S.C. § 11603(e)(2).

[16] See Basic Instruction 6.1, Pattern Jury Instructions, Civil, Committee on Pattern Jury Instructions, District Judges Association, Eleventh Circuit (2000).

finder and, thus, assumes the role of the jury. In this capacity, the judge's function includes weighing the evidence, evaluating the credibility of witnesses, and deciding questions of fact, as well as issues of law.[17]

## Discussion

The issues presented for determination by the Court are: (1) whether at the time of his removal from Belize on June 23, 2005 Adamas was a habitual resident of Belize; and, if so, (2) whether subsequent to Adamas' removal from Belize the Petitioner acquiesced in the retention of Adamas in the United States.

### Habitual Residence

The issue lying at the heart of this case is the habitual residence of Adamas Clark at the time of his removal from Belize on June 23, 2005. Neither the Convention nor ICARA define "habitual residence;" courts are encouraged to consider all the relevant facts and circumstances of each case in coming to a determination as to a child's habitual residence. See Brook v. Willis, 907 F. Supp. 57, 61 (S.D.N.Y. 1995) ("[T]he term 'habitual residence' was purposefully left undefined by the Convention so that its meaning could be determined according to the specific facts and circumstances of each case. Courts should not interpret the term technically or restrictively, but should examine every situation free of supposition.").

---

[17] See Childrey v. Bennett, 997 F.2d 830, 834 (11th Cir. 1993) (holding that "it is the exclusive province of the judge in non-jury trials to assess the credibility of witnesses and to assign weight to their testimony").

Courts in the United States and abroad have generally defined habitual residence "as the place where the child has been physically present for an amount of time sufficient for acclimatization and which has a degree of settled purpose from the child's perspective." Pesin v. Rodriguez, 77 F. Supp. 2d 1277, 1284 (S.D. Fla. 1999) (quoting Feder v. Evans-Feder, 63 F.3d 217, 224 (3d Cir.1995) (relying on Friedrich v. Friedrich, 983 F.2d 1396, 1401-03 (6th Cir.1993), and In re Bates, No. CA 122-89, High Court of Justice, Family Div'l Ct. Royal Courts of Justice, United Kingdom (1989))). "A determination of whether any particular place satisfies this standard must focus on the child and consists of an analysis of the child's circumstances in that place and the parents' present, shared intentions regarding their child's presence there." Feder, 63 F. 3d at 224. Where a child is too young to form an intention as to his habitual residence, the inquiry must turn to the actions of the parents. See Pesin, 77 F. Supp. 2d at 1285 ("Though older than the girl in Bates, the children sub judice were four and six years old at the time of the alleged wrongful retention. As such, the children's tender ages compel the Court to focus on their parents' actions and shared intentions."). In Pesin, the court considered numerous factors, including: (1) "the parties and the children resided in Caracas, Venezuela preceding their December 1998 trip to South Florida"; (2) the parents planned intention was a finite trip to the United States, as evidenced by round-trip airline tickets; (3) "the parties had packed for only a temporary visit, rather than a permanent move"; (4) "immediately before their retention, the children were enrolled for the entire school year in a Venezuelan school"; and (5) "Petitioner and Respondent did not discuss the children's enrollment at a Florida day school until

Respondent informed him . . . that she had unilaterally enrolled the children there for the second semester of the 1998-1999 school year." Id.

Further, when an alleged abandonment of a clearly established habitual residence for a new home is at issue, the court must determine not only whether the child was settled in his new home, but whether the prior habitual residence was abandoned, and the new home has supplanted the old "as the locus of the children's family and social development." Mozes v. Mozes, 239 F.3d 1067, 1084 (9th Cir. 2001). In Koch v. Koch, --- F.3d ---, 2006 WL 1620325 (7th Cir. 2006), the court found that the children had abandoned their previous habitual residence and obtained a new one "where the children went to live with both parents in a country that was the mother's native land and the father's chosen residence for most of his adult life. The move was on an open-ended basis, tied to financial and employment goals, without any clear limitations."

In reviewing all of the facts and circumstances of this case, it is clear that the Petitioner has established by a preponderance of the evidence that Adamas was wrongfully removed from his habitual residence of Belize. Looking at this issue solely from Adamas' perspective, it is undisputed that Adamas lived continuously in Belize from his birth on May 6, 2002 until November 2004. Further, even during the seven months that Adamas spent in the United States, he was in the continuous, at-home care of the Petitioner and never created the educational or social connections to the United States that are necessary to acclimatize a child to a new home.

In addition, looking to the intentions and actions of the parents, as the Court must, it is clear that the trip to the United States was intended, at least by the Petitioner, as a finite excursion outside of Belize.  First, it is plain that the trip to the United States in November 2004 was initially conceived merely as the third in a series of November to February trips by the Respondent, allowing him to participate professionally in the busy Thanksgiving to Valentine's Day jewelry season in the United States.  Second, the Petitioner and Jonelle traveled to the United States on tourist visas, which expired in May 2005.  Third, the parties left many of their household goods in Belize.  Fourth, while in Leesburg, neither the Petitioner nor the Respondent enrolled Adamas in any educational or social programs in the United States that would begin at a time after his return to Belize in June 2005.  Finally, other than a short visa extension to allow her to leave the United States legally, the Petitioner never initiated the processes necessary to remain in the United States and, in fact, rejected the Respondent's suggestion that they marry so that she could remain legally in this country.  And finally, in early June, 2005, the family had in fact returned to Belize, from which Adamas was surreptitiously removed by the Respondent later that month.

Accordingly, the Respondent's contention that Adamas abandoned his habitual residence in Belize is without merit.  The evidence established that the Petitioner always intended the trip to the United States in November 2004 to be a finite excursion. Whether the Respondent always intended to have his family remain in the United States or whether he changed his mind about returning to Belize sometime between November 2004 and

June 2005 is unclear.[18]  It is clear, however, that the Respondent's assertion that the Family returned to Belize in June 2005 for vacation lacks merit.  The Petitioner and Adamas had one-way tickets to Belize; the Petitioner had no legal documentation that would allow her to return to the United States; and there were no plans in place for the education of Adamas in the United States during the upcoming school year.  Further, the Respondent's argument that the Family's stay at the Bullet Tree Falls lot could only have been a camping trip because of the undeveloped nature of that lot is undercut by the fact that the lot was the Family's sole residence from June 2004 to November 2004.  Moreover, upon returning to Belize, the Respondent continued to improve the Bullet Tree Falls lot, erecting a shell house on that land.

Finally, the Respondent's explanation for leaving Belize with Adamas suddenly and without notice to the Petitioner only undercuts the Respondent's position in this proceeding.[19]  The Respondent claims that his sudden departure followed his discovery

---

[18] The Respondent presented evidence that he implemented a "five-year plan," whereby he would live and work in Leesburg with his family for five years, saving up funds to then return permanently to Belize and develop the Bullet Tree Falls lot.  The Court, however, is not convinced by the Respondent's evidence of a "five-year plan" that Adamas was to stay in the United States during that time, nor, indeed, that the "five-year plan" - if it would have been carried out - would have resulted in Adamas abandoning his habitual residence of Belize.  Moreover, even if the "five-year plan" existed, it would only serve to reveal that the Respondent, at most, intended that his family remain in the United States for five years, underscoring the finite nature of the Family's stay in the United States.

[19] It bears repeating that the Court in this case is not deciding the issue of custody.  It is merely deciding, based upon the habitual residence of the child, which judicial system should resolve the custody dispute.  That is the essence of the agreement the United States has made with other signatories to the Hague Convention.  The death threat as the Respondent perceived
(continued...)

that the Petitioner was planning his murder. This explanation, however, only highlights the fact that the Respondent did not return to the United States from a vacation, but, in fact, removed Adamas without any notice to or consent from the Petitioner because of fears for his own safety.

### Acquiescence

In light of the fact that the Court has determined that the Respondent wrongfully removed Adamas from his habitual residence of Belize, the Court must consider the Respondent's affirmative defense that subsequent to Adamas' removal from Belize the Petitioner acquiesced in the retention of Adamas in the United States.

"[A]cquiescence under the Convention requires either: an act or statement with the requisite formality, such as testimony in a judicial proceeding; a convincing written enunciation of rights; or a consistent attitude of acquiescence over a significant period of time." Friedrich v. Friedrich, 78 F.3d 1060, 1070 (6th Cir. 1996). The determination of acquiescence under the Convention is a subjective test. See Pesin, 77 F. Supp. 2d at 1288-89 (reviewing decisions from the United States, France and England).

The Court finds that the Petitioner has failed to establish by a preponderance of the evidence that subsequent to Adamas' removal from Belize the Petitioner acquiesced in the retention of Adamas in the United States. Indeed, the Respondent provided no credible

---

[19](...continued)
it - and the genuineness of that threat - is simply immaterial in this proceeding and will not be addressed here. The issue is one that commends itself to the Belizian judicial system if custody proceedings are instituted there.

evidence that the Petitioner acquiesced in the retention of Adamas in the United States. Instead, the filing by the Petitioner of the Application for Assistance under the Convention less than two months after Adamas' wrongful removal and the filing by the Petitioner and prosecution of this matter in this Court less than a year after Adamas' removal belies the Respondent's allegations of acquiescence. Moreover, the Petitioner's refusal to sign a paternity settlement agreement[20] prepared by the Respondent underscores her lack of acquiescence to the retention of Adamas in the United States.

## Conclusion

Accordingly, upon due consideration, it is Ordered that:

(1)   Petitioner Kristine Small's Petition for Return of Child (Doc. 1) is GRANTED;

(2)   Adamas Clark shall be RETURNED in the company of Petitioner Kristine Small to Belize;

(3)   Respondent Jeffrey Clark, and all persons in active concert or participation with him, shall immediately surrender Adamas Clark and any passport issued in the name of Adamas Clark to representatives of the United States Marshal's Service, and the Marshal's Service is empowered to enter any premises wherein Adamas might reasonably be found, and to use all reasonable force necessary to execute the commands of this Order;

(4)   Representatives of the United States Marshal's Service shall return Adamas Clark to Petitioner Kristine Small for purposes of their return to Belize;

---

[20] Respondent's Exhibit #24.

(4) The Clerk is directed to return to Jeffrey Clark his passport upon demand after Adamas Clark has departed the United States for Belize; and

(5) The Clerk is directed to enter judgment accordingly and close the file.

IT IS SO ORDERED.

DONE and ORDERED at Ocala, Florida this 17th day of July, 2006.

*[signature]*

UNITED STATES DISTRICT JUDGE

Copies to: Counsel of Record